**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF KENTUCKY**
**NORTHERN DIVISION**
**AT COVINGTON**

**CIVIL ACTION NO. 11-391-DLB**

**MICHAEL RAY SILER**                                                                 **PLAINTIFF**


**vs.**                               **MEMORANDUM OPINION & ORDER**


**MICHAEL J. ASTRUE,**
***Commissioner of Social Security***                                         **DEFENDANT**

**\*\*\*   \*\*\*   \*\*\*   \*\*\***

Plaintiff brought this action pursuant to 42 U.S.C.June 18, 2012 § 405(g) to obtain

judicial review of an administrative decision of the Commissioner of Social Security.  The

Court, having reviewed the record and the parties' dispositive motions, will **affirm** the

Commissioner's decision, as it supported by substantial evidence.

## I.   FACTUAL AND PROCEDURAL BACKGROUND

Plaintiff Michael Siler applied for a period of disability and disability insurance

benefits (DIB) on March 3, 2008, alleging disability beginning on August 24, 2007.  (Tr. 117-

125).  Plaintiff was 51 years old at the time of filing.  (Tr. 119).  Plaintiff alleges that he is

unable to work due to a heart attack, chronic obstructive pulmonary disease (COPD),

arthritis, and problems with his left hand, which he identified as the most disabling

condition.  (Tr. 143).  As a result of these ailments, Plaintiff claims that he experiences pain

throughout his hands, buttocks and back, and has difficulty sitting or standing for prolonged

periods of time.  (*Id.*)  Plaintiff also alleges that he has difficulty breathing.   (*Id.*).

Plaintiff's applications were denied initially and again on reconsideration. (Tr. 77-80, 85-87). At Plaintiff's request (Tr. 88-89), an administrative hearing was conducted on December 17, 2009 before Administrative Law Judge (ALJ) Deborah Smith. (Tr. 32-74). On February 5, 2010, ALJ Smith ruled that Plaintiff was not disabled and therefore not entitled to DIB. (Tr. 16-25). This decision became the final decision of the Commissioner when the Appeals Council denied Plaintiff's request for review on October 21, 2011. (Tr. 1-3).

Plaintiff filed the instant action on December 16, 2011. (Doc. # 1). The matter has culminated in cross-motions for summary judgment, which are now ripe for adjudication. (Docs. # 10, 11).

## II.  DISCUSSION

### A.    Overview of the Process

Judicial review of the Commissioner's decision is restricted to determining whether it is supported by substantial evidence and was made pursuant to proper legal standards. *See Colvin v. Barnhart*, 475 F.3d 727, 729 (6th Cir. 2007). "Substantial evidence" is defined as "more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Cutlip v. Sec'y of Health & Human Servs.*, 25 F.3d 284, 286 (6th Cir. 1994). Courts are not to conduct a *de novo* review, resolve conflicts in the evidence, or make credibility determinations. *Id.* Rather, we are to affirm the Commissioner's decision, provided it is supported by substantial evidence, even if we might have decided the case differently. *Her v. Comm'r of Soc. Sec.*, 203 F.3d 388, 389-90 (6th Cir. 1999). If supported by substantial evidence, the Commissioner's findings must be affirmed, even if there is

evidence favoring Plaintiff's side.  *Listenbee v. Sec'y of Health & Human Servs.*, 846 F.2d 345, 349 (6th Cir. 1988).  Similarly, an administrative decision is not subject to reversal merely because substantial evidence would have supported the opposite conclusion. *Smith v. Chater*, 99 F.3d 780, 781-82 (6th Cir. 1996).

The ALJ, in determining disability, conducts a five-step analysis.  Step 1 considers whether the claimant still performs substantial gainful activity; Step 2, whether any of the claimant's impairments, alone or in combination, are "severe"; Step 3, whether the impairments meet or equal a listing in the Listing of Impairments; Step 4, whether the claimant can still perform her past relevant work; and Step 5, whether a significant number of other jobs exist in the national economy which the claimant can perform.  As to the last step, the burden of proof shifts from the claimant to the Commissioner to identify "jobs in the economy that accommodate [Plaintiff's] residual functional capacity."  *See Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 474 (6th Cir. 2003); *see also Preslar v. Sec'y of Health & Human Servs.*, 14 F.3d 1107, 1110 (6th Cir. 1994).

**B.    The ALJ's Determination**

At Step 1, the ALJ found that Plaintiff has "apparently" not engaged in substantial gainful activity since August 24, 2007, the alleged onset date.  (Tr. 18).  At Step 2, the ALJ determined that Plaintiff's only severe impairment is coronary artery disease.   (*Id.*).  The ALJ recognized that Plaintiff had a number of other impairments which he found to be non-severe, including: hypertension, COPD, degenerative changes in the cervical spine, an abrasion and contusion to the left knee, left hand deformities, degenerative changes of the AC shoulder joint, obesity, anxiety, depression and alcohol abuse in remission.  (Tr. 18-21). At Step 3, the ALJ concluded that Plaintiff did not have an impairment or combination of

3

impairments that meets or medically equals one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1. (Tr. 21).

At Step 4, the ALJ found that Plaintiff possessed the residual functional capacity (RFC) to perform medium work as defined in 20 C.F.R. § 404.1567©. (Tr. 21). The ALJ also found that Plaintiff was able to climb ropes, ladders, and scaffolds only occasionally; he should avoid concentrated exposure to extreme heat, extreme cold, and humidity; and avoid concentrated exposure to hazards such as dangerous machinery and unprotected heights. (*Id*.). Based upon this RFC, the ALJ concluded that Plaintiff is unable to perform his past relevant work as a forklift driver and merchandise order picker. (Tr. 23).

Accordingly, the ALJ proceeded to the final step of the sequential evaluation. At Step 5, the ALJ found that Plaintiff was 50 years old on the alleged disability onset date, which is defined as an individual approaching advanced age. *See* 20 C.F.R. § 404.1563. The ALJ also found Plaintiff to have a limited education with the ability to communicate in English. (Tr. 23). Relying on the testimony of a vocational expert (VE) and considering Plaintiff's age, education, work experience and RFC, the ALJ concluded that there are a significant number of jobs in the national economy that Plaintiff could perform. (*Id*.). ALJ Smith therefore concluded that Plaintiff was not under a disability, as defined in the Social Security Act, from the alleged onset date through the date of her decision. (Tr. 24).

## C.  Analysis

Plaintiff argues that the ALJ committed two errors, but essentially argues three issues on appeal. First, Plaintiff argues that the ALJ erred in concluding that the majority of his impairments are not "severe." Second, Plaintiff claims that the ALJ did not properly consider the severity of his impairments in making a determination on his RFC. Finally,

4

Plaintiff contends that the ALJ improperly assessed his credibility. Each argument will be addressed in turn.

### 1. The ALJ did not commit reversible error at Step Two in finding that some of Plaintiff's impairments were not severe

Plaintiff argues that the ALJ erred by finding that his pulmonary, spinal, and musculoskeletal impairments were not "severe" at step two. At this step, the claimant has the burden to establish that "he suffers from a severe medically determinable physical or mental impairment." *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 548 (6th Cir. 2004). The severity determination is "a *de minimis* hurdle in the disability determination process." *Higgs v. Bowen*, 880 F.2d 860, 862 (6th Cir. 1988). "[A]n impairment can be considered not severe only if it is a slight abnormality that minimally affects work ability regardless of age, education and experience." *Id.*

Plaintiff argues that his pulmonary, spinal and musculoskeletal impairments had more than a minimal affect on his ability to work, and thus the ALJ erred in concluding otherwise. Plaintiff's argument, however, is misguided. At step two, the claimant has the burden to prove that at least one of his impairments is severe. *Simpson v. Comm'r of Soc. Sec.*, 344 F. App'x 181, 190 (6th Cir. 2009). If the ALJ finds that at least one of his impairments is severe, the ALJ must consider *both* the severe and non-severe impairments in the remaining steps. *Id.* (citing *Anthony v. Astrue*, 266 F. App'x 451, 457 (6th Cir. 2008)). "In other words, '[o]nce one severe impairment is found, the combined effect of *all* impairments must be considered, even if other impairments would not be severe.'" *Id.* at 190 (emphasis added) (quoting *White v. Comm'r of Soc. Sec.*, 312 F. App'x 779, 787 (6th Cir. 2009)). Therefore, the Sixth Circuit has explained that it is "legally irrelevant" that some

5

of a claimant's impairments were considered non-severe if others were found to be severe and the ALJ considers both the severe and non-severe impairments in the remaining steps. *Id.*

Here, ALJ Smith concluded that Plaintiff had only one severe impairment – coronary artery disease.  The ALJ then proceeded to the remaining steps, giving consideration to Plaintiff's severe and non-severe impairments.  In determining Plaintiff's RFC, the ALJ specifically noted that "[Plaintiff] stated that the pain is in his back and hand." (Tr. 22).  The ALJ also mentioned that Plaintiff has undergone surgery on his left hand.  (*Id.*).  Moreover, the ALJ commented that Plaintiff "has undergone little treatment for his musculoskeletal impairments which are allegedly disabling." (*Id.*).  Together, these statements indicate that the ALJ did consider Plaintiff's spinal and hand impairments at subsequent stages of the sequential analysis as required by 20 C.F.R. § 404.1545(a)(2). ("If you have more than one impairment.  We will consider all of your medically determinable impairments of which we are aware, including your medically determinable impairments that are not "severe," . . . , when we assess your residual functional capacity).

Plaintiff contends that the ALJ did not consider the arthritis in his right hand in reaching an RFC determination and therefore failed to comply with 20 C.F.R. § 404.1545(a)(2).  Plaintiff's assertion, however, is incorrect.  In determining Plaintiff's RFC, the ALJ stated that she "considered opinion evidence in accordance with the requirements of 20 C.F.R. § 404.1527 and SSRs 96-2p, 96-5p, 96-6p and 06-3p." (Tr. 21).  Accordingly, the ALJ considered Dr. Sudhideb Mukherjee's May 2, 2008 consultative examiner report, which in turn considered Plaintiff's arthritis.  (Tr. 367).  After reviewing Plaintiff's medical history, Dr. Mukherjee concluded that Plaintiff's complaints about the severity of his arthritis

were reasonable.   Therefore, Dr. Mukherjee opined that Plaintiff was limited to lifting/carrying 25 pounds frequently and 50 pounds occasionally. (Tr. 369). Plaintiff sought a second consultative exam on July 23, 2008, and again complained that he was suffering from arthritis. (Tr. 405). Dr. Allen Dawson concluded that there was no new evidence regarding Plaintiff's physical condition and therefore affirmed Dr. Mukherjee's prior RFC determination.   Although the ALJ never explicitly mentioned Plaintiff's right hand impairment, the ALJ nevertheless gave the impairment consideration by reviewing both consultative examiners' reports. *See Hamilton v. Astrue*, 5:09CV202, 2010 WL 411322, at *8 (N.D. Ohio Jan. 28, 2010) (holding that, although the ALJ did not specifically mention the claimant's non-severe impairments, the ALJ properly considered the claimant's non-severe impairments by considering the findings of the consultative examiner, which included findings on the non-severe impairments).

Likewise, although ALJ Smith did not explicitly reference Plaintiff's pulmonary impairment after step two, it is clear from the entirety of the decision that the ALJ considered Plaintiff's pulmonary impairment.  As discussed above, the ALJ considered the consultative examiners' reports in reaching an RFC determination, which  specifically addressed Plaintiff's pulmonary impairments.  Dr. Mukherjee opined that there was no clinical evidence of COPD, nor was Plaintiff on any anti-COPD medications. (Tr. 369-370). Dr. Mukherjee therefore concluded that Plaintiff's complaints about suffering from a pulmonary impairment were not reasonable. (Tr. 373).  Approximately three months after Dr. Muhkerjee rendered the report, Plaintiff sought reconsideration, and explained that his pulmonary condition had worsened because of the heat. (Tr. 407).  However, Dr. Dawson concluded that there was no new evidence that supported this complaint. (*Id.*).  Because

the ALJ considered each of these reports, which found that Plaintiff did not suffer from a pulmonary impairment, the ALJ met her duty under 20 C.F.R. § 404.1545(a)(2) to consider this non-severe impairment past step two.

Moreover, the ALJ's analysis of Plaintiff's pulmonary impairment at step two is consistent with the opinion of the consultative examiners, which suggests that the ALJ agreed with the consultative examiners at step four.  At step two, the ALJ stated:

> The claimant has chronic obstructive pulmonary disease (COPD).  An X-ray from August 2007 showed bilateral emphysematous disease.  However, the claimant continued smoking through 2008.   Little more is said of his respiratory impairment except to mention that it exists.  He was in no acute respiratory distress when examined in November 2008.  He had non-labored respirations and a normal respiratory effort.  He had no cough.

(Tr. 19) (internal citations omitted).

In effect, ALJ Smith reached two conclusions at step two concerning Plaintiff's pulmonary impairment.  First, the ALJ concluded that Plaintiff's pulmonary impairment was not "severe" pursuant to 20 C.F.R. § 404.1520©.   That was all that the ALJ was required to do at this step.  However, the ALJ went on to make a second conclusion relevant to the RFC determination. The ALJ implicitly found that recent objective medical evidence showed that Plaintiff no longer suffered from COPD or any other pulmonary impairment.  Therefore, at step two, the ALJ found that Plaintiff experienced minimal limitations from his pulmonary impairment.   Combining the ALJ's thorough explanation at step two with his consideration of the consultative examiners' opinions at step four, the ALJ considered Plaintiff's pulmonary impairment as required by the regulation.

In short, after the ALJ found that Plaintiff's coronary artery disease was a severe impairment, the ALJ completed steps three through five of the analysis and considered all

8

of Plaintiff's impairments.   Thus, it is "legally irrelevant" that Plaintiff's other impairments were determined to be not severe.  *Simpson*, 344 F. App'x at 190; *McGlothin v. Comm'r of Soc. Sec.*, 299 F. App'x 516, 522 (6th Cir. 2008); *Anthony v. Astrue*, 266 F. App'x 451, 457 (6th Cir. 2008); *Maziarz v. Sec'y of Health and Human Servs.*, 837 F.2d 240, 244 (6th Cir. 1987).   Ultimately, Plaintiff's claim that the ALJ erred in finding that some of his impairments were not severe is without merit.

### 2.   Substantial Evidence Supports the ALJ's RFC Determination

After concluding that Plaintiff's impairments or combinations of impairments did not meet or medically equal a listed impairment, the ALJ determined Plaintiff's RFC.  ALJ Smith concluded that Plaintiff has the RFC to perform medium work as defined in 20 C.F.R. § 404.1567© except he can climb ladders, ropes, and scaffolds only occasionally.   ALJ Smith also opined that Plaintiff should avoid concentrated exposure to extreme heat, extreme cold, and humidity.   Furthermore, the ALJ stated that Plaintiff should avoid exposure to hazards such as dangerous machinery and unprotected heights.   Plaintiff argues that the RFC determination is not supported by substantial evidence and does not accurately reflect his limitations.   Regarding his pulmonary impairments, Plaintiff argues that the ALJ should have also considered his stamina and endurance, and limited his exposure to pulmonary irritants.   Plaintiff also contends that the ALJ failed to account for his spinal impairments in the RFC.[1]   Lastly, Plaintiff asserts that the ALJ should have included a limitation on reaching, manipulating, and feeling in order to accommodate his

---

[1] Plaintiff acknowledges that the ALJ limited Plaintiff to occasional climbing of ladders, ropes, and scaffolds, and prohibited Plainitff from concentrated exposure to hazards such as dangerous machinery and unprotected heights.   Plaintiff argues, however, that the ALJ failed to specify which impairments were being accommodated by various limitations.   According to Plaintiff, the limitations opposed logically relate to Plaintiff's cardiovascular impairment, and not his spinal impairment.

hand impairments.  Each argument will be addressed in turn.

### i.    Pulmonary Impairments

The ALJ included at least two limitations on Plaintiff's RFC to accommodate his pulmonary impairments.  First, the ALJ determined that Plaintiff was capable of performing medium work, which "involves lifting no more than 50 pounds at a time with frequent lifting or carrying of objects weighing up to 25 pounds." 20 C.F.R. § 404.1567©.  This accounted for Plaintiff's limited stamina and endurance.  Second, the ALJ found that Plaintiff should "avoid concentrated exposure to extreme heat, . . ., and humidity."  (Tr. 21).  These limitations are supported by substantial evidence.

Although Plaintiff was diagnosed with COPD, the objective medical evidence indicates that Plaintiff did not suffer from pulmonary impairments that demanded greater limitations on his RFC.  The record evidence shows that Plaintiff began visiting Dr. Mark Middendorf on August 28, 2006 as his primary physician, and continued to visit him on a monthly basis through February, 2008.  (Tr. 312-358)  At the initial appointment, Dr. Middendorf reported that Plaintiff had normal respiratory effort and respiratory auscultation. (Tr. 357).  During 19 visits, Dr. Middendorf reported that Plaintiff had normal respiratory effort every time; Dr. Middendorf reported that Plaintiff had abnormal auscultation on only six occasions, usually consisting of occasional wheezing or rhonchi.  (Tr. 312-358).

During the course of Plaintiff's treatment with Dr. Middendorf, Plaintiff visited Dr. Paul Hirsch and Certified Physician's Assistant Josh Hill to receive an evaluation from cardiology specialists on his recent chest pains.  During his visit on September 5, 2007, Plaintiff complained of shortness of breath and wheezing.  (Tr. 288). The team of doctors concluded that his pulmonary discomfort was probably due to a beta blocker, and treated

him accordingly. (Tr. 289). Plaintiff returned one week later. (Tr. 286). At that time, the team of doctors noted that Plaintiff discontinued using metoprolo, which "significantly improved" his wheezing and shortness breath. (*Id.*). Plaintiff returned for a third time, and the doctors found that Plaintiff had not followed their instructions on treating his pulmonary condition. (Tr. 285). During a fourth visit, it was noted that Plaintiff's cough had improved since taking the medication properly. (Tr. 283). Ultimately, the records from Dr. Hirsch indicate that Plaintiff's pulmonary condition was treatable with proper medication.

Records from Plaintiff's inpatient treatment at St. Luke Hospital and Emergency Room treatment at St. Elizabeth Medical Center also reveal that Plaintiff had minimal objective signs of a pulmonary impairment. On August 24, 2007, a nurse assessed Plaintiff and concluded that he was not in respiratory distress, had normal non-labored respiration, normal respiratory effort, and no stridor. (Tr. 231). The nurse did note a few scattered wheezes. (*Id.*) Despite the nurse's objective findings, Plaintiff complained that he felt like he was not getting a deep breath. (*Id.*). That same day, Plaintiff was taken to radiology for a chest x-ray. (Tr. 252). The x-ray revealed that Plaintiff's "lungs are well expanded and appear clear of active disease. There is no evidence of pneumothorox." (*Id.*).

On August 26, 2007, Plaintiff's pulmonary condition was again assessed at St. Elizabeth Medical Center. (Tr. 264). Again, it was reported that Plaintiff had "unlabored respirations. Good breath sounds. No audible rales, ronchi, or wheezing." (*Id.*).

Two consultative examiners reviewed Plaintiff's objective medical evidence to assess his pulmonary condition. Dr. Mukherjee concluded that there was no clinical evidence of COPD, nor was claimant on any anti-COPD medicines. (Tr. 369-70). Thus, Dr. Mukherjee concluded that Plaintiff's complaints about his pulmonary impairment were

unreasonable.  Plaintiff sought another consultative examiner's opinion after alleging that his pulmonary condition had worsened due to the heat.  (Tr. 405).  Dr. Dawson found that there was no new evidence to support this assertion, and affirmed Dr. Mukherjee's opinion.

Plaintiff's life-style choices also indicate that he suffered minimal limitations from his pulmonary impairments.  The Sixth Circuit has repeatedly held that a claimant's continued smoking militates against the credibility of his disabling breathing order.  *Brown v. SSA*, 221 F.3d 1333, at *1 (6th Cir. 2000) (table); *Ninness v. Sec'y of Health & Humans Servs.,* 884 F.2d 580, at *3 (6th Cir. 1989); *Auer v. Sec'y of Health & Human Servs.*, 830 F.2d 594, 595 (6th Cir. 2987); *Sias v. Sec'y of Health & Human Servs.*, 861 F.2d 475, 480 (6th Cir. 1988). Despite Plaintiff's cardiac and pulmonary troubles, he continued to smoke cigarettes.  At his administrative hearing, he testified that he quit smoking in 2008.  (Tr. 35).  Prior to that he testified that he smoked between a pack-and-a-half to two packs a day.  (*Id.*).  In 2007, Plaintiff showed that he tried to quit smoking at least twice, but returned to smoking between 3/4 and a pack of cigarettes a day.  (Tr. 316-344).  Thus, Plaintiff's continued smoking up to 2008 also indicates that Plaintiff's pulmonary impairment is not as severe as he suggests.

Despite Plaintiff's limited history of pulmonary impairments, Plaintiff argues that the ALJ failed to consider his sensitivity to allergens and his diagnosis of allergic rhinitis. However, substantial evidence supports the ALJ's finding.  There is no objective medical evidence to show that Plaintiff's allergies or allergic rhinitis lasted for a continuous period of at least 12 months.  Plaintiff alleges that his allergies were first documented on April 27,

2012.  To the contrary, Plaintiff was diagnosed with nashopharyngitis[2] on that date.  (Tr. 339).  Plaintiff alleges that his allergies were also documented on May 3, 2012.  However, Plaintiff was actually diagnosed with sinusitis on that day.  (*Id.*).  It was not until May 23, 2007 that Dr. Middendorf first diagnosed Plaintiff with allergies, and prescribed Allegra D to relieve related symptoms.  (Tr. 335).  On August 14, 2007, Dr. Middendorf again noted that Plaintiff suffered from allergies and bronchitis, and prescribed Allegra D and Mucinex.  (Tr. 325).  There is no other mention of Plaintiff's allergies after 2007, and he was no longer taking medication for allergies on March 4, 2008.  (Tr. 148).  As such, Plaintiff has not shown that this impairment lasted or is expected to last for a continuous period of at least 12 months and thus cannot be considered because it does not meet the durational requirement of 20 C.F.R. § 404.1509.

Put simply, although Plaintiff had been diagnosed with COPD, there is no objective evidence to show how the disease limited his acts of daily living.  Instead, the overwhelming objective evidence shows that Plaintiff had normal non-labored respirations and was never in respiratory distress during his many doctor's visits.  Moreover, whenever Plaintiff suffered from shortness of breath or wheezing, doctors were able to control his breathing distress through medication.  Ultimately, substantial evidence supports the RFC determination as it relates to Plaintiff's pulmonary impairments.

### ii.    Spinal Impairment

Plaintiff argues that the ALJ erred in failing to include any limitations related to his spinal impairments in the RFC determination.  Aside from the limitations associated with

---

[2] Nasopharyngitis is defined as inflammation of the nasal passages and of the upper part of the pharynx.  The American Heritage Medical Dictionary (2007).

medium work, the ALJ did not include additional limitations on Plaintiff's RFC to accommodate Plaintiff's spinal impairment. Nonetheless, the ALJ's RFC assessment with respect to Plaintiff's spinal impairment is supported by substantial evidence.

Plaintiff accurately[3] points out that he did complain of low back pain on multiple occasions.[4] On January 31, 2007, Plaintiff underwent five x-rays of his cervical spine after complaining of neck pain. Radiologist Stephen Moeller, M.D., reported that Plaintiff's cervicovertebral bodies are normal in height and alignment, and there was no acute cervical fracture or subluxation. (Tr. 358). Dr. Moeller also noted minimal degenerative changes of the cervical intervertebral disc spaces. (*Id.*). Furthermore, Dr. Moeller stated that Plaintiff's prevertebral soft tissues were normal. (*Id.*).

On July 3, 2007, Plaintiff visited Dr. Middendorf for low back plain, and explained that he had fallen down steps the night before. (Tr. 328). Dr. Middendorf noticed a small knot to the right of the S4 bone and decreased ranged of motion in all directions. (*Id.*). However, Dr. Middendorf also reported that Plaintiff had normal deep tendon reflexes.

The next day, Plaintiff went to St. Elizabeth Medical Center for an x-ray of his back. Radiologist Eric Brandser, M.D., reported that three views of Plaintiff's lumbosacral spine

---

[3] Plaintiff suggests that evidence of his spinal impairment can be found at Tr. 317, 319, 321 and 323. However, the Court finds no mention of Plaintiff's spinal impairments on those documents.

[4] One instance in which Plaintiff complained of back pain is worth mentioning, but deserves little weight. The most recent mention of Plaintiff's spinal impairment comes from an emergency room report dated November 17, 2008. Earlier that day, Plaintiff's wife called police to their residence after she found Plaintiff looking for pain pills in her purse. (Tr. 422). The police gave Plaintiff the option to go to jail or the hospital. (*Id.*). Plaintiff chose the hospital. (*Id.*). Upon arriving, Plaintiff explained that he was in pain throughout his body, including his cervical spine, and ranked his pain a seven out of ten. Two hours later, Plaintiff ranked his overall pain a three out of ten. (Tr. 423). Despite his alleged pain, Plaintiff explained to the hospital staff that he had "no complaints and no need to be here." (Tr. 422). Given the circumstances that Plaintiff arrived at the hospital, his statement that he had no need to there, and the fact that his pain quickly decreased, this report cannot show a credible report of pain.

showed no fracture or acute abnormality.   (Tr. 305).   Dr. Brandser did observe mild intervertebral narrowing at L4-L5 and L5-S1.   (*Id.*).

On January 18, 2008, Plaintiff returned to his primary care physician, Dr. Middendorf, and again complained of lower back pain with pain extending into his left leg. (Tr. 314).  Dr. Middendorf prescribed medications and heat treatment, and ordered an x-ray for further diagnosis.   (*Id.*).

Plaintiff underwent another x-ray on January 29, 2008 which yielded unremarkable results.  (Tr. 304).   Radiologist Jeff Dardinger, M.D., concluded that the vertebral bodies and posterior elements were intact.   (*Id.*).   He also reported that the disc spaces were preserved.   Dr. Dardinger did however note "very tiny anterior osteophytes present diffusely."   (*Id.*).[5]

On February 27, 2008, Plaintiff returned to Dr. Middendorf and complained of lower back pain.  (Tr. 313).  Notably, Plaintiff rated his pain a four on a ten scale, with ten being the worst.  (*Id.*).   Plaintiff also indicated that medications helped his back pain.  (*Id.*).  After examining Plaintiff, Dr. Middendorf ordered Plaintiff to take his medications as previously prescribed.  (*Id.*).

Despite Plaintiff's complaints of pain, the medical record supports the ALJ's finding. When Plaintiff was asked to rank the pain in his back, he ranked it at a four out of ten – far from debilitating.   Plaintiff's spine was x-rayed at least three times.   Each time, the radiologist concluded that Plaintiff's disc spaces were either preserved, or showed minimal degenerative changes.  Moreover, the x-rays showed that Plaintiff's cervicovertebral bodies

---

[5] Plaintiff cited transcript page 307 as additional support for the proposition that he has suffered loss of disc height or narrowing of joint space in his spinal cord.  However, Tr. 307 contains the first of six pages of notes from Dr. Due, who treated Plaintiff for injuries to his right shoulder and left hand.

were normal in height and alignment.  Ultimately, this objective evidence does not support any additional limitations.

Plaintiff challenges that his spinal pain has been linked to soft tissue injures and degenerative disc disease, which cannot be visible on an x-ray.  However, Plaintiff has the burden of proving the existence and severity of limitations caused by his limitations.  *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 474 (6th Cir. 2003).  Having failed to offer any objective proof of his limitations, Plaintiff has offered nothing to contradict the ALJ's findings.

Aside from the objective medical evidence, the ALJ's determination is also supported by the opinions of the consultative examiners.  Dr. Sudhideb Mukherjee considered Plaintiff's complaint that he had difficulty sitting or standing for a prolonged time, but concluded that those complaints were not credible because they were not supported by medical evidence.  (Tr. 373).  Therefore, Dr. Mukherjee found that Plaintiff could lift 50 pounds occasionally, 25 pounds frequently; stand for about six hours in an eight-hour workday; and sit for six hours in an eight-hour work day.

Dr. Allen Dawson, another consultative examiner, was asked to reconsider Dr. Mukherjee's consultative opinion.  After reviewing the medical evidence, Dr. Dawson concluded that Dr. Mukherjee properly assessed Plaintiff's exertional limitations and therefore affirmed Dr. Mukherjee's RFC assessment.

Ultimately, the medical record does not warrant additional limitations to Plaintiff's RFC regarding his spinal impairment.  Aside from sporadic complaints of pain, the objective medical evidence does not indicate that Plaintiff's spinal impairment would prevent him from performing medium work.  Accordingly, the RFC assessment with respect to Plaintiff's

16

spinal impairment is supported by substantial evidence.

### iii.    Hand impairments

Plaintiff argues that the ALJ failed to consider the severity of his hand impairments in reaching the RFC determination.  Specifically, Plaintiff argues that the ALJ should have included limitations on reaching, manipulations, and feeling.  However, substantial evidence supports the RFC determination as it relates to Plaintiff's hand impairments.

In 1978, Plaintiff's left hand was crushed in a punch press while at work.  (Tr. 435). The injury left him with "deformities of all his fingers . . . and flexion contractures[6] of the ring and small finger." (Tr. 307-08).  That same year, he underwent arthrodesis on the PIP joints of the long and ring fingers of his left hand to relieve pain and instability.  (Tr. 307).  Despite the hand injury, Plaintiff was gainfully employed  for nearly three decades, working as a forklift driver and merchandise picker for at least fifteen of the later years.  (Tr. 126-127; 39-40).

At his administrative hearing, Plaintiff explained that he had limited use of his left hand throughout his career.  (Tr. 49).  Plaintiff stated that he compensated for his left hand by relying on his right hand.  As a result, Plaintiff alleges that he "wore . . . out" his right hand such that he "can use it pretty good for a little while and then it just gets sore and stiff."  (*Id.*).  Nevertheless, Plaintiff also stated that he is able to make a partial fist and pick up objects with his left hand, though he is unable to button his shirt.  (Tr. 50).

---

[6] A contracture is "a condition of fixed high resistance to passive stretch of a muscle, resulting from fibrosis of the tissues supporting the muscles or the joints, or from disorders of the muscle fibers." Dorlands' Illustrated Medical Dictionary 377 (27th ed. 1988).

While the objective medical evidence certainly supports Plaintiff's allegation that he has some limited use of his hands, substantial evidence supports the ALJ's RFC determination with respect to his hand impairments.  On December 8, 2006, Plaintiff visited Dr. Middendorf and complained of increased pain in both hands, with more pain in his right hand.  (Tr. 350).  Dr. Middendorf found that Plaintiff's hands had abnormal range of motion. (Tr. 351).

Plaintiff had a series of visits with Dr. Middendorf after suffering acute trauma to his hands.  On January 5, 2007, Plaintiff visited Dr. Middendorf after he smashed his left ring finger while moving furniture at his house.  (Tr. 344).  Dr. Middendorf observed that Plaintiff's fourth finger on his left hand had flexion deformities.  (Tr. 345).  Notably, Dr. Middendorf also reported that Plaintiff had minimal pain.  (*Id.*).  Plaintiff visited Dr. Middendorf again on June 6, 2007 after hitting his left thumb with a hammer the night before.  (Tr. 332).  Dr. Middendorf observed a contusion on his left thumb, but reported no significant limitation.  (Tr. 333).  On June 27, 2007, Plaintiff visited Dr. Middendorf after sustaining a third injury to his hand.  (Tr. 330).  Plaintiff reported that he busted his knuckle on his right hand and felt like he "pulled" his left thumb while working on his truck.  (*Id.*). Dr. Middendorf observed swelling, but also found that Plaintiff had normal range of motion and was able to grip with his hands.  (Tr. 331).  Together, each of these instances show that while Plaintiff suffered trauma to his hand, his treating physician found the trauma to have little overall effect.

On October 17, 2007, Plaintiff returned to Dr. Middendorf and renewed his complaints about pain in both hands.  (Tr. 318).  Dr. Middendorf observed swelling in both hands and a deformity of the fourth finger on Plaintiff's left hand.  (Tr. 319).  Dr. Middendorf

also referred Plaintiff to Dr. Thomas Due, an orthopedic specialist, for further examination and treatment.  (*Id.*).

Plaintiff reported to Dr. Due on October 26, 2007.  (Tr. 307).  After reviewing Plaintiff's history, Dr. Due had x-rays taken of Plaintiff's left hand, which showed "some degenerative arthritis of the PIP joints."  (*Id.*).  Dr. Due observed that Plaintiff's ring finger only moves a couple of degrees, and recommended arthrodesis to alleviate the pain.  (Tr. 308).  Dr. Due also found "a jog of motion at the PIP joint of the long finger . . . but it is not painful."  (*Id.*).  Notably, Dr. Due commented that "[Plaintiff] uses the hand pretty well, otherwise, despite the deformities of these fingers."  (*Id.*).

On November 27, 2007, Plaintiff underwent arthrodesis on the PIP joint of his left ring finger.  (*Id.*).  One week after the surgical procedure, Dr. Due reported that the surgery was not fully successful.  (*Id.*).  As a result, Plaintiff underwent a second procedure on December 11, 2007, where Dr. Due repeated the arthrodesis to the PIP joint of Plaintiff's left finger.

Six weeks after the second surgery, Plaintiff returned to Dr. Due for a follow-up examination.  (Tr. 311).  Dr. Due noted that "[t]he finger looks good" and "[i]t looks quite solid."  (*Id.*).  Plaintiff was also able to make a fist and was not in pain.  Dr. Due limited Plaintiff to light work while he continued to strengthen his finger.

Plaintiff returned to Dr. Due one month later.  Upon examination, Dr. Due reported that Plaintiff "has excellent hard [sic] grip strength.  There is no pain.  It feels quite solid.  This is *asymptomatic*."  (Tr. 311) (emphasis added).  Because of Plaintiff's progress, Dr. Due allowed Plaintiff to return to full duty.  (*Id.*).

On December 10, 2009, two years after Plaintiff's second surgery, Plaintiff visited the Hand and Rehabilitation of Western Hills for an evaluation of his hands.[7]  (Tr. 435). Mary Nester, a registered occupational therapist and certified hand specialist, examined Plaintiff's grip strength and range of motion in both hands.  She found that his average grip strength with his left hand ranged from 14.67 pounds to 24.33 pounds, depending on the position of his hand, while his right hand grip strength ranged from 12.67 pounds to 36.33 pounds.  (Tr. 437).  Ultimately, Nester concluded that Plaintiff has a 24% impairment in his left hand[8] and 14% impairment in his right hand.  (Tr. 438; 443).

Unquestionably this evidence shows that Plaintiff has some limitation in both hands. The ALJ appropriately accounted for those limitations in finding that Plaintiff is capable of performing medium work.  The Social Security regulations define "medium work" as being capable of "lifting no more than 50 pounds at a time with frequent lifting or carrying of objects weighing up to 25 pounds." 20 C.F.R. § 404.1567.  Plaintiff's grip strength supports this determination.  His orthopedic doctor, Dr. Due, reported that he had excellent grip strength approximately two months after his second surgery.  Moreover, Plaintiff was found to be capable of carrying up to 24.33 pounds in his left hand and 36.33 pounds in his right hand, meaning a combined weight of 60.66 pounds.  While Plaintiff correctly points out that he does not have the grip strength of the average person, substantial evidence supports

---

[7]  Although Plaintiff now complains about his right hand, he only reported injuries to his left hand during his visit to the Rehabilitation facility.

[8]  Plaintiff has provided two separate hand impairment assessments from Nester.  Both assessments were rendered on December 10, 2009 and are based on the same test results.  In one assessment, Nester opined that Plaintiff's left hand impairment was 24%, while in another assessment she found that he had a 34% impairment in the same hand.  The Court sees no reason for these inconsistent findings.  In Plaintiff's Motion for Summary Judgment, he cites Nester's first assessment where she found that he had a 24% impairment in his left hand.  Therefore, the Court will also rely on that assessment.

the "medium work" RFC determination. After all, if Plaintiff had average grip strength, his hand impairment would not prevent him from doing work at a higher exertional level.

Substantial evidence also supports the ALJ's finding that a limitation on reaching, manipulation or feeling is unwarranted. At the administrative hearing, Plaintiff was asked whether he could grasp objects, pick up a coffee cup, do dishes, and pick up plates. (Tr. 50). Plaintiff responded that he was capable of picking objects up with his fingers, however he had difficulty buttoning buttons. (Tr. 50-51). He also stated that was capable of driving, which indicates that he has enough flexibility in his fingers to grip a steering wheel. (Tr. 50). Most importantly, Plaintiff testified that his hand impairments primarily limited the amount of weight he could lift. Thus, substantial evidence supports the ALJ's conclusion that additional limitations on reaching, manipulation, and feeling were not necessary, and that Plaintiff's limitations in this regard were adequately addressed in the RFC finding of "medium work."

### 3. The ALJ Properly Assessed the Credibility of Plaintiff's Testimony

Finally, Plaintiff argues that ALJ Smith improperly assessed his credibility because the reasons given for discounting Plaintiff's credibility do not withstand careful scrutiny. Contrary to the ALJ's findings, Plaintiff contends that each of his subjective complaints are supported by the record. Plaintiff's argument, however, is unpersuasive.

Upon review, the Court must give the ALJ's credibility determination great weight and deference. *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 475 (6th Cir. 2003). "However, the ALJ is not free to make credibility determinations based solely upon an intangible or intuitive notion about an individual's credibility." *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 247 (6th Cir. 2007). Instead, "the ALJ must make a determination of

21

the credibility of the claimant in connection with his or her complaints based on a consideration of the entire case record." *Id.* Moreover, "Social Security Ruling 96-7p requires the ALJ explain his credibility determinations in his decision such that it 'must be sufficiently specific to make clear to the individual and to any subsequent reviewers the weight the adjudicator gave to the individual's statements and the reasons for that weight." *Id.* at 248. The reviewing Court must then review the ALJ's credibility finding to determine whether it is reasonable and supported by substantial evidence. *Id.* at 249.

Here, the ALJ found that Plaintiff's overall credibility is poor. The ALJ offered eleven justifications for this finding:

(1) Plaintiff represented that he was unable to perform substantial gainful activity when he applied for DIB. This representation is belied by the fact that Plaintiff was receiving unemployment benefits at the time he filed a DIB claim, which would require Plaintiff to state that he is able, willing and ready to work;

(2) Plaintiff alleged that he was unable to work as of August 24, 2007, yet he stopped working in February 2008;

(3) Plaintiff offered inconsistent statements about whether his medications cause side effects;

(4) Plaintiff mows grass for 1-2 hours at a time, but claims that he cannot sit/stand, walk very long because of his back;

(5) Plaintiff continued smoking through 2008 despite having heart disease;

(6) Plaintiff has undergone little treatment for his allegedly disabling musculoskeletal impairments;

(7) Plaintiff was able to work for nearly 30 years after injuring his left hand in 1978;

(8) Plaintiff has undergone minimal treatment for his depression and anxiety, and his psychiatric condition was repeatedly noted as stable in 2008-2009;

(9) Plaintiff ranked his pain at a three out of ten, with ten representing the most severe pain;

(10) Plaintiff had no chest pains as of September 2009; and

(11) Plaintiff possibly misused, or abused, pain medication.

(Tr. 22).

While several of these findings may not be supported by the record, the ALJ's ultimate credibility determination is supported by substantial evidence. First, the ALJ reasonably discounted Plaintiff's credibility because Plaintiff was receiving unemployment benefits at the time he applied for DIB. "Applications for unemployment and disability benefits are inherently inconsistent." *Workman v. Comm'r of Soc. Sec.*, 105 F. App'x 794, 801 (6th Cir. 2004). When a claimant files for unemployment, he is stating that he is ready, willing and able to work. *Id.* Yet, when a claimant files for disability benefits, he is stating that he is unable to work. *Id.* Thus, it was reasonable for the ALJ to consider Plaintiff's inconsistent representations to the government in assessing his credibility. *See id.*

Plaintiff argues that his application for disability benefits and unemployment benefits are not inconsistent, and should not impeach his credibility. Specifically, Plaintiff alleges that he believed he was capable of performing sedentary work at the time he applied for DIB, which is consistent with his representation that he is "ready, willing and able" to work at the time he applied for DIB. Under the Medical Vocational Guidelines, if Plaintiff were capable of performing sedentary work, he would still be considered disabled because of his age, limited education and unskilled work experience. 20 C.F.R. § Part 404, Subpart

23

P, Appendix 2.  Therefore, Plaintiff argues that he truthfully alleged he was disabled under the Vocational Guidelines and truthfully represented that he was ready, willing and able to work for purposes of unemployment benefits.

While Plaintiff's argument about the application of the Vocational Guidelines is legally correct, his argument remains unpersuasive.  He did not represent that he believed he was capable of performing sedentary work at the time he filed for DIB.  Instead, at the time he filed for DIB, he represented that he "became *unable to work* because of [his] disabling condition on August 24, 2007." (Tr. 119) (emphasis added).  This representation is entirely inconsistent with stating that he is "ready, willing and able" to work for purposes of unemployment benefits.  Thus, the ALJ properly relied on this inconsistency in discrediting Plaintiff's testimony.

Second, the ALJ reasonably relied on Plaintiff's smoking habit in discrediting his testimony.  The Sixth Circuit has held that a claimant's continued smoking against the advice of his physician can serve to discredit complaints of disabling pain.  *Sias v. Sec. Health and Human Servs.*, 861 F.2d 475, 480 (6th Cir. 1988); *Mullins v. Sec. of health and Human Servs.*, 836 F.2d 980, 985 (6th Cir. 1987) (finding substantial evidence of no severe nonexertional impairment to accommodate the claimant's pulmonary impairment where the claimant was a heavy smoker).  Here, Plaintiff admitted to smoking between a pack-and-a-half to two packs of cigarettes a day until 2008.  (Tr. 35).  Medical records confirm that Plaintiff had short periods of time where he did not smoke, but overall he continued to smoke until 2008.  Not only did Plaintiff smoke, but he also gave conflicting reports about how much he smokes.  For example, on August 24, 2007, he reported that he smoked one pack of cigarettes a day.  (Tr. 230).  Ten minutes later he reported that a smoked one-and-

a-half-packs a day.  (*Id.*).  Thus, Plaintiff's smoking habit, and inconsistency about how much he smokes, serves as one of several facts that discredit his complaints.

Third, the ALJ emphasized that Plaintiff twice characterized his pain at a level three out of ten, with ten being most severe, in discrediting Plaintiff's complaints.  Plaintiff responds that the ALJ "cherry-picked" two statements, which were made over a year apart, in an attempt to discredit his testimony.  Plaintiff argues that these two reports are counterbalanced by three instances where he reported his pain to be much higher.  This argument is without merit.

While the ALJ referenced two particular instances where Plaintiff reported a low level of pain, a review of the entire record indicates that these references accurately characterize the majority of Plaintiff's complaints. Plaintiff underwent surgery on his left hand on November 27, 2007, and again on December 11, 2007.  (Tr. 308-10).  On January 15, 2008, Plaintiff reported "a little discomfort" in his finger.  (Tr. 311).  On January 29, 2008, six weeks after the second surgery, Plaintiff reported no pain in his finger.  (*Id.*).  Again, on February 26, 2008, Plaintiff reported no pain.  (*Id.*).

On February 27, 2008, Plaintiff visited Dr. Middendorf because he was experiencing lower back pain.  He reported his pain to be four out of ten.  (Tr. 313).  Two months later, Plaintiff visited David Chiappone, Ph. D., for a psychological evaluation and rated his pain as a three out of ten.  (Tr. 361).  On May 20, 2008, Plaintiff complained of lower back pain and rated his pain a six, but also advised that medications alleviated the pain.  (Tr. 419). Plaintiff renewed his complaints of lower back pain on October 17, 2008 and rated his pain a seven with medications.  (Tr. 418).  Plaintiff returned to the doctor in February and June of 2009, rated his pain at a five each time and also reported that medications were helping.

25

(Tr. 416-17).

The ALJ's credibility determination reasonably reflects this history of pain. Specifically, the ALJ recognized that Plaintiff's medically determinable impairments could be expected to cause alleged symptoms to some degree. However, Plaintiff's allegations that he was incapable of working were inconsistent with the majority of his pain complaints, ranging from no pain to level five. Notably, Plaintiff rated his pain at a six or higher only three times, and each time he also reported that medication helped. On balance, the ALJ's reliance on Plaintiff's own pain ratings to discredit Plaintiff's testimony is reasonable and supported by the record.

Fourth, the ALJ correctly stated that Plaintiff has undergone little treatment for his musculoskeletal impairments. Plaintiff did undergo two surgeries on his left hand in November and December 2007, which would be considered serious treatment. (Tr. 308, 310). However, at Plaintiff's two-month post-operation appointment, his orthopaedic surgeon explained that Plaintiff has excellent hand grip strength and is no pain. The doctor also reported that the finger felt quite solid. Aside from pain medications, there is no evidence of any further treatment to his left or right hand after February 26, 2008. (Tr. 311).[9] More specifically, there is no indication that Plaintiff visited another specialist or continued a rehabilitation program on his hands. Thus, the record supports the ALJ's conclusion that Plaintiff has undergone little treatment on his right hand.

---

[9] Plaintiff did visit the Hand and Rehabilitation of Western Hills on December 10, 2009 to have his hands examined. During that visit, an occupational therapist tested his hands for strength and range of motion. However, there is no indication that Plaintiff received any additional treatment from the Hand and Rehabilitation facility.

Likewise, Plaintiff visited an orthopaedic surgeon in 2005 about discomfort in his right shoulder.  (Tr. 307).  The orthopaedic surgeon originally feared that Plaintiff had suffered a rotator cuff tear that would require surgery.  (*Id.*).  Before trying surgery, the surgeon gave Plaintiff a subacromial injection and an oral bust of steroids, and ordered an aggressive rehabilitation program.  On Plaintiff's next visit, the surgeon noted that Plaintiff's "shoulder has dramatically improved" and "he is starting to do a lot more with it including overhead." (Tr. 307).  The surgeon also told Plaintiff to return if he had any more problems, but Plaintiff never returned with shoulder complaints.  (*Id.*).  Thus, while Plaintiff correctly argues that he did undergo treatment, the treatment appears to be limited in duration and it was wholly successful.

Despite these findings, Plaintiff argues that he did receive significant treatment by taking muscle relaxants and narcotic pain medications.  Pursuant to 20 C.F.R. § 404.1529©, the ALJ is required to consider a number of factors in evaluating the intensity and persistence of a claimant's symptoms.  While Plaintiff attempts to use his history of pain medicine to refute the ALJ's finding that he has undergone little treatment, the regulations make clear that the ALJ is to consider medications and treatment separately.  Under, 20 C.F.R. § 404.1529(c)(3)(iv), the ALJ is required to consider the type, dosage, and effectiveness of any medications taken by the claimant, and whether they alleviate the pain or other symptoms.  Separately, under 20 C.F.R. § 404.1529(c)(3)(v), the ALJ is to consider "treatment, *other than medication*, [the claimant receives or has received] for relief of pain . . . or other symptoms." (emphasis added).  Although Plaintiff has shown a continued use of pain medication under § 404.1529(c)(3)(iv), substantial evidence supports the ALJ's conclusion that Plaintiff has not undergone significant treatment under §

404.1529(c)(3)(v).    Thus, the ALJ's reliance on Plaintiff's limited treatment for musculoskeletal impairments is reasonable and supported by substantial evidence.

Fifth, the record supports the ALJ's finding that Plaintiff has undergone "little real treatment for his depression and anxiety."  (Tr. 22).  Plaintiff argues that this finding is inaccurate because he has undergone treatment for anxiety.  However, his "treatment' has been limited to taking benzodiazepine (Xanax) for several years.  As stated above, the ALJ is to consider the claimant's treatment and medications separately, pursuant to 20 C.F.R. §§ 404.1529(c)(3)(iv) and (v).  Here, the ALJ correctly found that there is no indication of psychological *treatment*, which negates Plaintiff's complaints about his psychological impairments.  *See Payne v. Comm'r of Soc. Sec*, 402 F. App'x 109, 118 (6th Cir. 2010) (affirming the district court's decision to discredit the claimant's alleged mental limitations because the claimant was not receiving current psychological treatment other than anti-anxiety medications).

Finally, the ALJ discredited Plaintiff's testimony because the record shows that Plaintiff had a tendency to abuse pain medications.  For instance, Plaintiff testified that his wife controls his medications because he had a tendency to abuse them.  (Tr. 61). Similarly, records from St. Elizabeth South's Emergency Room, dated November 11, 2008, confirm Plaintiff's history of abusing pain medications.  (Tr. 422).   Earlier that day, Plaintiff's wife found him looking for pain medications in her purse while he already appeared "high on something." (*Id*.).  Plaintiff's wife called the police, who took Plaintiff to the emergency room for a psychiatric evaluation.  (*Id*.).   Thus, the ALJ's finding that Plaintiff is not credible, in part, because of his history of misusing medicine is reasonable and supported by substantial evidence.

28

Ultimately, the ALJ's credibility determination is reasonable and supported by substantial evidence. Plaintiff accurately points out that many of the ALJ's reasons for discrediting his complaints are not supported by the record.[10] However, as explained above, Plaintiff offered at least six reasons for his credibility determination which are supported by the entire record. The ALJ's credibility determination is certainly supported by relevant evidence that a reasonable mind might accept as adequate. Thus, the ALJ's credibility determination is supported by substantial evidence.

## III.  CONCLUSION

For the reasons stated herein, the Court concludes that the ALJ's finding that Plaintiff was not disabled for purposes of the Social Security Act was supported by substantial evidence. Accordingly, for the reasons stated,

**IT IS ORDERED** as follows:

1.  The decision of the Commissioner is supported by substantial evidence and is hereby **AFFIRMED**;

2.  Plaintiff's Motion for Summary Judgment (Doc. # 10) is hereby **DENIED**;

3.  Defendant's Motion for Summary Judgment (Doc. # 11) is hereby **GRANTED**;

---

[10] For example, the ALJ emphasized that Plaintiff was capable of mowing grass for one to two hours, which refuted his claims that he cannot sit, stand or walk for long periods of time. However, the ALJ mischaracterized Plaintiff's statement. Plaintiff actually reported that he mowed the grass for up to two hours with frequent breaks.

Similarly, the ALJ suggested that Plaintiff gave inconsistent statements about side effects he experiences from his medications. On March 4, 2008, Plaintiff reported that Xanax made him drowsy. On March 21, 2008, Plaintiff reported that he experienced no side effects from Xanax. While these statements are inconsistent, it is not reasonable to rely on them to discredit Plaintiff's testimony because these statements were made three weeks apart when Plaintiff was taking different combinations of medications.

4.      A Judgment affirming this matter will be entered contemporaneously

herewith.

This 5th day of July, 2012.



Signed By:

*David L. Bunning*   DB

**United States District Judge**

G:\DATA\SocialSecurity\MOOs\Covington\2-11-391 Siler MOO.wpd